**STATE**

v.

**Mark G. COHEN.**

**87–130–C.A.**

Supreme Court of Rhode Island.

March 4, 1988.

OPINION

SHEA, Justice.

On September 18, 1986, Mark G. Cohen was convicted on one count of assault with intent to commit first-degree sexual assault in violation of G.L. 1956 (1981 Reenactment) § 11–37–8 and one count of second-degree sexual assault in violation of § 11–37–4, as amended by P.L. 1984, ch. 59, § 1. The defendant was sentenced to twenty years at the Adult Correctional Institutions, with ten years suspended, for the assault with intent to commit first-degree sexual assault and ten years for the second-degree sexual assault. The sentences are to run concurrently. We affirm.

The victim of the sexual assault testified at trial that she met defendant at a lounge in Warwick, Rhode Island, on the night of October 23, 1985. She stated that he introduced himself as Mark McKenna, an assumed name he used throughout their brief acquaintance. They met again during the following week in Attleboro, Massachusetts, where they danced and had drinks in a hotel lounge. She claimed that there was no physical contact between she and defendant during these two meetings except once when defendant gave her "a light kiss on the cheek."

On October 29, 1985, the victim and defendant met again at a hotel in Attleboro, Massachusetts. At approximately 8:10 p.m. the victim left her car at the hotel and went in a gray Subaru driven by defendant to a lounge in East Greenwich, Rhode Island, for a drink.[1] At approximately 9:30 p.m. they went to another lounge in Warwick, Rhode Island. At approximately 11:30 p.m. the victim told defendant that she was ready to go home, and defendant agreed. When the victim approached the Subaru, she noticed a leather case in the back seat that "looked like a gun case." She became "very nervous."[2]

The defendant did not take the victim home. Rather, against her will, he drove to a sand bank somewhere in or near West Greenwich, Rhode Island. The victim con-

James E. O'Neil, Atty. Gen., Thomas Dickinson, Jane McSoley, Asst. Atty. Gen., for plaintiff.

William Reilly, Public Defender, Barbara Hurst, Catherine A. Gibran, Asst. Public Defenders, for defendant.

1. It was later revealed that the Subaru belonged to another girlfriend of defendant.

2. The leather case was subsequently found to contain a cue stick for pool, not a gun.

tends that after parking the car, defendant demanded that she remove her clothes. When she refused, defendant stated "[Y]ou take your clothes off or I'll blow your [expletive deleted] head off."

The victim testified to acts which unquestionably constituted assault with intent to commit first-degree sexual assault in violation of § 11–37–8 and second-degree sexual assault in violation of § 11–37–4.

The defendant's version of the facts differs from that of the victim in several material respects. Most importantly, defendant argued at trial that the victim's participation in the sexual acts was consensual.

■ The arresting officer testified that on October 30, 1985 at approximately 1:40 a.m., he observed the victim jump out of the gray Subaru (with her pants semi-undone and her blouse hanging outside of her pants) and run hysterically toward his cruiser, screaming, "[T]his guy tried to rape me." Further questioning elicited the following colloquy:

"Q. [By the prosecutor.] Officer, could you describe [the victim's] physical appearance when you first observed her?

"A. She appeared very emotional, very flustered. She ran right up to the side of my vehicle. I was able to notice that it seemed like her wrists were rubbed raw, they weren't discolored as of yet, but they were rubbed raw and obvious and like scruff marks.

"Q. Did you notice anything else about her?

"A. Other than her clothing was very, you know, pants were undone, very emotional, *seemed like she had been through a lot.*" (Emphasis added.)

The defendant moved to strike the statement "seemed like she had been through a lot." His motion was denied by the trial justice.

On appeal defendant argues that this statement by the police officer was an improper lay opinion that invaded the province of the jury. He relies strongly on two cases in which we vacated and remanded convictions on the grounds of admittance of improper and prejudicial lay opinion: *State v. Nicoletti*, 471 A.2d 613 (R.I. 1984), and *State v. Desmarais*, 479 A.2d 745 (R.I. 1984). In *Nicoletti* the key issue was identification. At trial, two witnesses identified the defendant. Afterward the police officer who took these witnesses' original descriptions on the night of the crime was asked how he would characterize these original descriptions of the intruder. He responded: "I would say [they are] fairly close. The only problem would be maybe they may have made them a little too tall, but other than that, they are pretty much on the money." Similarly, in *Desmarais* a police officer expressed his opinion at trial concerning the consistency of testimony given by prosecution witnesses at trial with statements previously given to the police.

*Nicoletti* and *Desmarais* are readily distinguishable from the case before us. In *Nicoletti* and *Desmarais* the police officers had invaded the province of the jury by expressing what amounted to an opinion of other witnesses' credibility. In the present case, however, the police officer was merely expressing a logical inference drawn from facts that he *directly witnessed.* It is entirely logical for a lay witness who sees a disheveled and hysterical woman with apparent skin abrasions, screaming "[T]his guy tried to rape me," to conclude that "she seemed like she had been through a lot."

In *State v. Bowden*, 473 A.2d 275, 280 (R.I. 1984), we set out a two-part test for admitting lay opinion. First, the lay witness must have had an opportunity to view the person or event at issue. Second, the lay witness must be able "to give concrete details on which the opinion was founded." *Id.* The police officer's testimony in the case before us clearly satisfied both parts of this test. Accordingly, the trial justice correctly ruled his testimony admissible.

Although not applicable in the present case, it is worth noting that the definition of opinion testimony by lay witnesses in the newly adopted Rhode Island Rules of Evidence is not a departure from our common-law definition. The new definition sets out a two-part test for determining

admissibility requiring that lay opinions be "(A) rationally based on the perception of the witness and (B) helpful to a clear understanding of his testimony or the determination of a fact in issue." R.I. R. Evid. 701. As the advisory committee's note explained:

"[I]t is clear that the Rhode Island Supreme Court has accepted FRE 701 with the express caveat that a lay witness 'has had an opportunity to observe the person and to give the concrete details on which the inference or description is founded.' [State v.] *Fogarty, supra,* 433 A.2d [972] at 976 [R.I.1981]. This condition is implicit in the federal rule and implementation of it is a matter of judicial administration under Rule 611." R.I. R. Evid. 701, advisory committee's note.

■ The defendant next argues that the court improperly admitted certain physical evidence without showing a continuous chain of custody. The evidence objected to included a length of rope, a roll of duct tape, used duct tape, four beer cans, a tennis ball, and a white sock. These objects were used by defendant in commission of the offense.

The defendant argues that there were several breaks in the chain of custody in regard to each object. For example, all the objects were contained in the Subaru which was towed to the police station after defendant's arrest. The objects were then seized by the police under warrant the following day. The defendant asserts that the police officer who identified the objects failed to state where he put the keys to the Subaru between the time of arrest and the actual search.

The defendant misunderstands the relevance of showing chain of custody. As we stated in *State v. Infantolino,* 116 R.I. 303, 312, 355 A.2d 722, 727 (1976), "[A] showing of a continuous chain of possession is a more effective guarantee of the reliability of an exhibit than a reliance upon identifying marks or labels usually found on an exhibit." In order for a party to admit physical evidence, "[w]hat must be shown is the reasonable probability that no one

has tampered with the exhibit." *Id.* Thus, a showing of continuous chain of custody is relevant only to the weight of the evidence, *not to its admissibility.* The state in this case made a sufficient showing that the evidence was not tampered with. The defendant offered no evidence to rebut this showing. Accordingly, the evidence was properly admitted.

■ Finally, defendant argues that the trial justice failed to instruct the jury properly concerning the necessity of resistance by the complainant. The trial justice instructed the jury as follows:

"[T]he state must prove, within the definition of force and coercion, that this Defendant, by the application of force and coercion, accomplished sexual contact [by] a threat, where the person threatened reasonably believes that the Defendant has the present ability to carry out, to execute the threats. One who submits to that type of a threat is submitting to the application of force and coercion. *One who finds oneself in a deserted area, late at night, does not have to engage in heroics to save one's virginity or reputation. You must judge the acts of the victim, in light of the circumstances then pertaining, to determine whether her conduct in those circumstances was reasonable or unreasonable.*"
" * * *

"If you find that [the victim] consented to whatever you find went on in the front seat of that car then you must acquit the defendant of all charges * * * . If she consented, there is no proof beyond a reasonable doubt of force and coercion. If she consented, then there is no unauthorized or malicious touching. *If her will was overcome, however, her ability to say no was overcome because of fear, because of threats, then she need not struggle, she need not become a hero, she need not take a beating in order to preserve her virginity.*" (Underscored portions are those objected to by defendant.)

The defendant took the portions of the charge underscored in the above quotation

completely out of context and argued that the trial justice effectively concluded for the jury that any resistance on the part of the victim would have been fruitless. However these portions of the charge taken in context with the full charge show that the trial justice made no improper. inferences. The jury was properly instructed that it had to find that the victim did not consent to the alleged acts in order to find defendant guilty.

In *State v. Carvalho*, 122 R.I. 461, 467, 409 A.2d 132, 135–36 (1979), we stated that:

"Today the law does not expect a woman, as part of her proof of opposition or lack of consent, to engage in heroics when such behavior could be useless, fruitless, or foolhardy. Fighting to protect one's virtue can be a risky business. All that is required is that the woman offer such resistance as seems reasonable under all the circumstances."

Given that the victim testified that she had submitted to the sexual assault only after the defendant had threatened her life in a deserted area, with the apparent ability to carry out that threat, the trial justice's instructions were completely appropriate under *Carvalho*.

For these reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.