STATE

v.

Daniel N. TAVARES, Jr.

No. 90–392–C.A.

Supreme Court of Rhode Island.

May 10, 1991.
Rehearing Denied July 3, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., John J. Hogan, Sp. Asst. Atty. Gen., for plaintiff.

William A. DiMitri, William C. DiMitri, Jackvony & DiMitri, Providence, for defendant.

## OPINION

MURRAY, Justice.

The defendant, Daniel N. Tavares, Jr. (defendant), is appealing his conviction for kidnaping (G.L.1956 (1981 Reenactment) § 11–26–1), first-degree sexual assault (G.L.1956 (1981 Reenactment) § 11–37–2, as amended by P.L.1984, ch. 355, § 1), second-degree sexual assault (G.L.1956 (1981 Reenactment) § 11–37–4, as amended by P.L.1984, ch. 59, § 1), and extortion (G.L. 1956 (1981 Reenactment) § 11–42–2). The defendant premises his appeal on two grounds. He contends that the trial justice improperly denied his request to reopen the case for the purposes of allowing newly discovered expert testimony. Further he claims that his constitutional right to confrontation was violated by allowing a toxicologist's report to be admitted in the absence of the person who had performed the test.

The facts of this case are in dispute by the parties. However, for purposes of this appeal it is sufficient to say that the sixteen-year-old purported victim in this case (we shall refer to her fictitiously as Gloria) alleges that she was kidnaped, tied up, and repeatedly raped by three men (including defendant) over a twenty-four-hour period during Christmas of 1985. The defendant admits that he traveled with Gloria from party to party in his car on the evening of December 24, 1985. However, he denies that he ever touched the victim.

Gloria summed up her story by stating that she escaped from her bondage about 3 p.m. Christmas Day. She ran from an auto-body garage where she was being held to a nearby home. From there the authorities were called, and Gloria was brought to the hospital for medical treatment. Gloria was not seriously injured despite having been tied up and repeatedly raped by the three men. She had a bruise on her right upper arm and tenderness to her left temple. The hospital administered a "rape crisis" kit by taking certain specimens from Gloria's body.

Gloria may or may not have been residing with her mother at the time, but in any event the battered women's shelter placed her and her infant (who was not with Gloria during the ordeal) with a "host family." The battered women's center places its overflow and "special cases" of battered women with host families. In this case, the host family consisted of a Mr. and Mrs. Campbell, the Campbell's two young children, and Mrs. Campbell's adult sister, Connie Cornman. Gloria stayed with the Campbells for one week.

Ms. Cornman plays a pivotal role in this appeal. At the time of Gloria's placement in the Campbell home, Cornman had been working for three and a half years at the RCA Evaluation and Treatment Center (Center) in Cranston. At that moment she held the position of senior supervisor, supervising a staff of fifteen. The Center is a "loft" facility, operating a behavior-modification program for teenage adolescents aged thirteen to eighteen. It caters mostly to runaways and "street kids." Typically the center's clients have emotional problems that involve drugs and alcohol. Nearly all the clients are victims of rape or incest. Even though the center is a privately operated facility, its sole financial support is the State of Rhode Island. As Cornman said, the center has handled the state's most difficult cases; youngsters who could not be placed in halfway houses because they are so violent they would "self-destruct."

Cornman graduated from Michigan State University in 1981 with a major in education and a minor in child psychology. When she started working at the center, she received six months of on-the-job training, including specialized training in cognitive skills with respect to persons who have been raped or sexually abused. During Cornman's three and a half years with the center, she specifically counseled over seventy clients, about forty-five of whom were

rape or incest victims. Based on these credentials, defendant offered Cornman as an expert in the field of sexually abused children.

At the conclusion of six days of trial, after both parties made final arguments but before the judge charged the jury, defense counsel made a motion to reopen his case. He represented that he had just been notified that Cornman was available to testify on defendant's behalf.

The court held a hearing out of the presence of the jury to consider defendant's motion. At the hearing Cornman testified that during the one-week period Gloria stayed in the Campbell home, she had an extensive opportunity to observe Gloria. Relying upon this observation of Gloria, Cornman testified that Gloria did not act like a teenager who had been recently raped.

Specifically, Cornman was prepared to testify to a jury, if permitted, that some of the characteristics of recently raped women are agitated behavior, shock, sleeplessness, anger, and denial. Cornman said she expected Gloria to be "a real baggage of mess;" that she would be covered with bruises and rope marks, agitated, sleeping all the time, and be withdrawn and unsociable. To Cornman's surprise, Gloria did not exhibit any of these characteristics. Rather, she was "chatty" and concerned with talking to her boyfriend who was imprisoned in California. She enjoyed talking to her friends on the phone and was planning to go out partying with them on New Year's Eve. Cornman also testified that she looked at Gloria's legs and hips and saw no visible bruising. Cornman said she thought this lack of physical injury was inconsistent with the bruising normally incident to a three-man violent rape over a twenty-four-hour period. The thrust of defendant's questioning at this hearing outside of the jury focused on eliciting Cornman's expert opinion. She concluded that relying upon her perception of Gloria's mental and physical state after having lived with her for one week, that Gloria was not raped. Defense counsel's questioning went as follows:

"Q. Now, these basic characteristics that you told us about Miss Cornman, which would be indicative of a person recently raped as in this case, brutally raped, if her story is to be believed, did you see any of them displayed by [Gloria]?

"A. Not at all.

"Q. Ms. Cornman, based upon your experiences with children between 13 and 18 years old, and based upon your educational background, based upon what you told us here today as to certain characteristics that could be displayed by a person subjected to this kind of trauma, do you have an opinion why [Gloria] would say such a thing [that she had been raped]?"

The justice sustained the prosecution's objection to this last question.

## REOPENING THE CASE TO ALLOW CORNMAN'S TESTIMONY

■ A motion to reopen a case to introduce additional evidence is addressed to the discretion of the trial justice. A decision made in the exercise of such discretionary power will not be disturbed by this court on appeal absent a showing of an abuse of discretion. *State v. Benevides*, 420 A.2d 65, 68 (R.I.1980).

In deciding whether to reopen the case, the trial justice was concerned with three issues: first, did Cornman qualify as an expert. Second, was her testimony predicated upon facts legally sufficient to provide a basis for her opinion, *Greco v. Mancini*, 476 A.2d 522, 525 (R.I.1984). Lastly, is Cornman's proposed testimony inadmissible under the rules of evidence as an attempt by one witness to express an opinion on the credibility of another witness, in this case, the victim Gloria.

After hearing the testimony of Cornman, the trial justice reached the following conclusion on the record as quoted below.

"This testimony, in essence, strikes at that very issue. I mean, if this witness has been brought into this Courtroom to testify as to whether or not [Gloria] suffered bruises, * * *—this isn't the case. She has been asked, after observing her

for five or six days, based on your own experience, education, training, in the field of assisting a child, children who have been sexually abused, did [Gloria] manifest any of those symptoms that you have in your experience observed? The answer is no."

■ Rhode Island law is clear that no witness, expert or otherwise, may testify that another witness is lying or faking. *State v. Correra,* 430 A.2d 1251, 1255 (R.I. 1981). The defendant says Cornman is being offered to impeach Gloria's credibility and that such testimony does not constitute her calling Gloria a liar. We disagree.

■ Our analysis is aided by a very recent case decided by the Massachusetts Supreme Judicial Court. *See Commonwealth v. Montanino,* 409 Mass. 500, 567 N.E.2d 1212 (1991). In *Montanino* a male defendant was charged with unnatural sexual intercourse with a fifteen-year-old male. Four years after the alleged incidents, the victim reported the matter to the police. The commanding officer of the sexual-assault unit of the Cambridge police conducted the investigation. At trial the victim made several statements damagingly inconsistent with his original report to the officer. To rehabilitate his case, the prosecutor asked the officer on the stand, "And, would you tell us, Sergeant, whether or not you have an opinion as to whether in your initial discussions with victims, [whether you tend] to get more or less than the complete details [as compared to what] you eventually learn [from the victim] regarding the incident?" *Id.* at 502, 567 N.E.2d at 1213. This officer responded that "most" victims he interviewed "eventually provided more details regarding the assault than they initially revealed." *Id.* at 502–03, 567 N.E.2d at 1213.

The *Montanino* defendant challenged this question because it called for the officer to give his opinion that the victim was a credible witness. That is, by allowing the officer to testify that the irregularities in the victim's statements were consistent with the manner in which truthful sexual-assault victims relate their experiences, the officer would be offering his opinion that the *Montanino* victim was just as credible as other sexual-assault victims. *Id.* at 504, 567 N.E.2d at 1214. In striking the officer's testimony, the Massachusetts Supreme Judicial Court held that although the officer was not literally stating his opinion of the victim's credibility, his testimony had the same substantive import. In the court's words, even though the officer's testimony " 'fell short of rendering an opinion on the credibility of the specific [witness] before the court, we see little difference in the final result. It would be unrealistic to allow this type of ... testimony and then expect the jurors to ignore it when evaluating the credibility of the complaining [witness].' " *Id.* Accordingly the court reversed the conviction because it concluded that the officer's testimony was an improper attempt to bolster the victim's credibility.

In the instant case we are faced with an analogous problem. In *Montanino* the prosecution offered an opinion that the victim's testimony was *consistent* with that of like victims. Here defendant is offering an opinion that the victim's testimony is *inconsistent* with that of like victims. Although we recognize defendant's argument that there is a fine line between offering a witness to impeach a second witness' credibility, and offering a witness to opine that a second witness is not credible, we think this case falls into the latter category. As the trial justice properly noted, this witness is not being called to testify about facts that she perceived. Rather, defendant readily admits that the witness is being offered to give her opinion on the question of whether an attack actually took place. If the witness were to give personal observations concerning the crime that contradicted Gloria's testimony, that would be proper evidence to impeach Gloria's credibility. But here we essentially have a witness who proposes to testify that she has looked at the evidence and has formed an opinion that no attack occurred.[1] Whether

1. This case is distinguishable from *State v. Cohen,* 538 A.2d 151 (R.I.1988). In *Cohen* a police

officer witnessed an attempted rape victim jump from a car in a disheveled condition, hysterical-

this opinion is stated directly or clothed in terms of "Gloria's mental and physical disposition is inconsistent with like rape victims" is irrelevant. As the *Montanino* court said, any way the matter is phrased, the jury will perceive such testimony as a conclusory opinion about the victim's credibility. Accordingly the trial justice properly ruled that Cornman's testimony was inadmissible and hence the trial justice did not err in refusing to allow defendant to reopen the case.

## TOXICOLOGIST'S REPORT

As part of its case in chief the state elicited testimony from Nancy R. Hanley, a supervisor at the Rhode Island Health Department Forensic Toxicology Laboratory. This laboratory analyzed the "rape kit" and recorded the results in a toxicology report. Hanley supervised the performance of the rape-kit tests. Although she did not personally perform the tests, the initial results were reported to her and she ordered that additional tests be performed. As part of her duties as supervisor, she signed the toxicology report indicating that she had reviewed it and that the work had been completed. Hanley also served as the keeper of records for trial purposes.

Over defendant's objection the court allowed into evidence the toxicology report. The report indicated the presence of acid phosphatase, an acid occurring in high concentrations in semen. However, the tests were negative on the presence of sperm. The report was admitted upon Hanley's

testimony that the report was a Record of Regularly Conducted Activity. Although the trial transcript does not refer to the rules of evidence, in substance the justice allowed the report to come in as a Rule 803(6) of the Rhode Island Rules of Evidence hearsay exception. Defense counsel objected on the basis that he would be unable to cross-examine the person who actually performed the tests as to the testing procedures used.[2]

Defense counsel did not cite to any rules of evidence when he made his objection at the trial court. Before this court, he cites that admitting the report under Rule 803(6) is "error because Rule 803(8)(B) specifically excludes matters observed by law enforcement personnel." The defendant concedes that the state has made a diligent, good-faith effort to locate the person who actually performed the tests. That person has left the employ of the state.

The question of admitting reports relating to medical affairs into evidence without the testimony of the report maker is one we dealt with several years ago in *State v. Manocchio*, 497 A.2d 1 (R.I.1985), *habeas corpus granted*, 708 F.Supp. 473 (D.R.I. 1989), *grant of habeas corpus reversed*, 919 F.2d 770 (1st Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991). At the time we decided *Manocchio* in 1985, Rhode Island had not yet adopted the Federal Rules of Evidence. We decide the instant case under the Rhode Island Rules of Evidence, which is pat-

---

ly screaming, "This guy tried to rape me." The officer testified in regard to the victim's emotional state and physical appearance. He was also asked, "Did you notice anything else about her?" The officer responded, "other than [that] her clothing was very, you know, [her] pants were undone, [and that she was] very emotional, [it] *seemed like she had been through a lot.*" *Id.* at 153. We allowed the emphasized portion of the officer's testimony because we said the officer was "merely expressing a [layman's] logical inference drawn from facts that he *directly witnessed.*" *Id.*

The present case is distinguishable from *Cohen* in that Cornman is offering an opinion as to Gloria's condition as compared to like rape victims. Whether this is considered an expert or a laymen's opinion is irrelevant. The purpose of such a comparison is solely to prove that be-

cause of a disparity between Gloria's condition and that of the average rape victim, Gloria must not have been a rape victim and thus Gloria is lying. In *Cohen* the officer was not attempting to give an opinion about the victim's credibility by saying the victim's appearance was consistent with a rape victim's, nor was the officer giving an opinion that the victim had been attacked. Rather, the officer was describing a crime scene, stating facts he had observed and fair inferences drawn therefrom.

2. Hanley testified concerning the standard procedures used by the toxicology laboratory in analyzing rape kits. She additionally testified in response to a question from defense counsel that as far as she knew, these standard procedures were adhered to in this case.

terned after the Federal Rules and which became effective in 1987.

The defendant is relying on a legal question that we raised in *Manocchio* but did not decide. The question posed is this: if a record is admissible under Rule 803(6), but the record is a public record and fails to satisfy Rule 803(8), then is the record inadmissible even though Rule 803(6) is satisfied? *See Manocchio*, 497 A.2d at 6. In this case we find it unnecessary to decide this question since the report is admissible under both Rule 803(6) and Rule 803(8).

We begin our reasoning by examining G.L.1956 (1989 Reenactment) § 23–1–8. This section obliges the state director of health to provide toxicological assistance to the police authorities. Section 23–1–8 states:

"Toxicologist—Crime detection.—The director of health shall appoint in accordance with law a suitable and qualified toxicologist to conduct examinations of evidence in connection with scientific crime detection, and for such purpose the director shall cooperate with the Rhode Island state police, the department of the attorney general, and other law enforcement agencies in the matter of scientific crime detection."

■ By virtue of this section defendant says the toxicologist, an employee of the department of health, is a "police officer or other law enforcement personnel" within the meaning of Rule 803(8)(B). Rule 803(8)(B) states: The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * *

"(8) *Public Records and Reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth * * * (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement perconnel [personnel]."

The United States Court of Appeals for the First Circuit agreed with our statement in *Manocchio* that medical examiners are not law-enforcement personnel for purposes of Rule 803(8)(B). That court said,

"[A] medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case." *Manocchio v. Moran*, 919 F.2d 770, 777 (1st Cir.1990) (quoting *State v. Manocchio*, 497 A.2d 1, 7 (R.I.1985)). Analogously, the toxicologist, a health department employee like a medical examiner, does not become a law-enforcement person by virtue of the fact that he or she has a statutory obligation to cooperate with the police and to perform scientific crime-detection tests.

■ In practice the toxicologist's cooperation consists of receiving the rape kit from the hospital, analyzing the specimens, and forwarding the laboratory results to the authorities. There appears to be no close contact between the toxicologist and the police. It does not appear that the toxicologist has seen the police report or has been informed of any details relating to the alleged crime. Accordingly we rule that health department toxicologists are not law-enforcement personnel for purposes of Rule 803(8)(B). Since defendant does not contest the justice's finding that the report is a Rule 803(6) regularly conducted activity record, and defendant does not raise any other argument in regard to Rule 803(8), we conclude that the report was properly admitted under the rules of evidence.

■ The defendant further alleges that admission of the toxicology report violates the confrontation clause of the United States Constitution. The defendant alleges that because the toxicologist does not operate under "statutorily regularized procedures" like the State Medical Examiner (*see* G.L.1956 (1989 Reenactment) chapter 4 of title 23), the toxicologist's report does not contain "particularized guarantees of trustworthiness" and is thus constitutionally unreliable. *See Manocchio*, 919 F.2d at 776 (confrontation clause requires reliability in order to admit hearsay; reliability can be demonstrated by showing particularized guarantees of trustworthiness) (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980)). In support of his argument, defendant cites the

First Circuit's *Manocchio* case and implies that having statutorily regularized procedures for the performance of autopsies was essential to the First Circuit's finding that autopsy reports are reliable. We disagree.

The First Circuit statement that defendant is referring to reads in full as follows:

"[R]eliability of the [medical examiner's] descriptive observation[s of the decedent's corpse] is enhanced by the routine and repetitive circumstances under which such reports are made. And since the reports are made at the time of the autopsy, their reliability is far greater than a later-recollected description by the preparer of the record. Like information contained in public records, reliability is further enhanced by the existence of statutorily regularized procedures and established medical standards according to which autopsies must be performed and reports prepared, and by the fact that autopsies are carried out in a laboratory environment by trained individuals with specialized qualifications." 919 F.2d at 778.

The instant case is clearly distinguishable. First, we are not dealing with a subjectivity that is inherent to a medical examiner's autopsy wherein the examiner gives his professional descriptive observations of a corpse. Here, we are dealing with straightforward laboratory analyses of specimens. We do not perceive that there are subjective characterizations called for in this process. Therefore, if autopsy reports are reliable despite the fact that they contain highly subjective material, laboratory reports are all the more reliable since they contain purely objective material.

Second, we believe defendant is placing undue reliance on the First Circuit's statement that autopsy reports are reliable because they are conducted under "statutory regularized procedures." The type of procedures that that court referred to are, namely, that certain deaths must be reported to the Medical Examiner's Office and that the medical examiner must make inquiry into the cause and manner of certain deaths. Thus the First Circuit was merely referring to the fact that the medical examiner is obligated by law to perform certain autopsies. If the First Circuit opinion is read to require "statutory regularized procedures," then § 23–1–8 satisfies that requirement in our judgment.

In sum we find that toxicology reports created by the department of health are just as reliable as a medical examiner's autopsy report. Hence, allowing this hearsay to be introduced at trial does not violate the defendant's rights under the confrontation clause.

The defendant's appeal is denied and dismissed. The judgment of the Superior Court is affirmed.