STATE

v.

Edward HASLAM, Jr.

No. 94–158–C.A.

Supreme Court of Rhode Island.

Aug. 10, 1995.

Aaron L. Weisman, Assistant Attorney General, Jeffrey Pine, Attorney General, Providence, for plaintiff.

John A. MacFadyen, Providence, for defendant.

## OPINION

**WEISBERGER, Chief Justice.**

This case comes before us on the appeal of the defendant, Edward Haslam, Jr., from a judgment of conviction entered in the Superior Court on four counts of first-degree child molestation in violation of G.L.1956 (1981 Reenactment) § 11–37–8.1, as amended by P.L.1988, ch. 219, § 1, and on two counts of second-degree child molestation in violation of § 11–37–8.3, as amended by P.L.1988, ch. 219, § 1. We vacate the judgment of conviction and remand for a new trial. The facts insofar as pertinent to this appeal are as follows.

The complaining witness, whom we shall call Amy, was born in September 1978. From the ages of one to three Amy did not live with her parents but rather lived at the home of her maternal grandparents in Shannock, Rhode Island. In 1981, when Amy was three, her mother, Janice, moved into the grandparents' home and Amy continued to live in Shannock with her grandparents and her mother. Amy's older brother, Kevin, and younger brother, Alex (not their real names), also lived at the grandparents' home in Shannock. This living arrangement continued until the middle of 1986. In August 1986, shortly before Amy's eighth birthday, her mother married defendant, Edward Haslam, Jr. (Haslam or defendant). A few months prior to the marriage Amy, her mother, Kevin, and Alex all moved in with defendant at his home in Wakefield, Rhode Island. Kevin, however, was placed in a youth home in November 1986. The marriage produced two daughters, Lisa and Susan (not their real names). By August 1990 Janice and defendant were divorced.

Amy testified that between the ages of eight and eleven she was repeatedly sexually molested by her stepfather, defendant. Haslam testified in his own defense and denied that he had ever molested Amy. Haslam claimed that Amy concocted the allegations of sexual abuse at the behest of her mother. A jury found defendant guilty on all six counts of the indictment. His motion for new trial was denied. This appeal followed. In support of his appeal defendant raises a number of issues. We shall address only those that involve error.[1] Additional facts will be furnished as needed to deal with specific issues.

### I

Following Amy's testimony the state presented the testimony of Kathy Swink (Swink), a counselor that Amy had been seeing periodically over the preceding two years and three months. Swink testified that she had been counseling Amy since February 1991 when Amy was referred to her by the Department of Children, Youth and Families (DCYF). Over defense objection, Swink was permitted to testify that Amy was referred to her for sexual-abuse-recovery counseling. During the course of Swink's direct examination, the prosecutor repeatedly elicited from Swink the nature of the counseling she provided and framed his questions in such a manner as to emphasize that the counseling

---

1. Contrary to the state's contention, we find each claim of error that we shall address in this opinion to have been sufficiently preserved for appellate review.

was for sexual-abuse recovery. For example, the following exchanges took place:

"Q. Directing your attention to your private practice, has your private practice focused on any particularized area of concern in counseling?

"Defense counsel: I object.

"The court: What was your objection?

"Defense counsel: No foundation at this point.

"The court: Objection overruled.

"A. I have worked primarily with people who have been abused either physically, sexually or emotionally due to dysfunctional family situations.

" * * *

"Q. You said earlier that your practice focuses primarily on abuse either sexual, physical or emotional?

"A. That's correct.

"Q. Is it for one of those things or something else that you counsel [Amy]?

"Defense counsel: Objection.

"The court: What's your objection?

"Defense counsel: It's leading, there is no foundation.

"The court: Objection overruled, she may respond.

"A. Yes, she was referred to me for sexual abuse recovery counseling.

"Q. Sexual abuse recovery counseling, is that what you said?

"A. Yes.

" * * *

"Q. I do understand she was referred to [you] by DC[Y]F, and you have been counseling her for sexual abuse recovery, is that what you testified to?

"A. Yes.

"Q. Has that been the focus of your counseling throughout the period of February '91 through May of '93?

"A. Yes, it has with all of its ramifications."

Swink's first knowledge of and contact with Amy occurred in February 1991, approximately six months after the last inci-

dent of sexual abuse allegedly occurred. The defendant claims that because Swink had no firsthand knowledge that Amy had been sexually molested, her testimony that she counseled Amy for sexual-abuse recovery constituted impermissible vouching for the credibility of the complaining witness. We agree.[2]

The determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury. *State v. James,* 557 A.2d 471, 473 (R.I.1989); *State v. Desmarais,* 479 A.2d 745, 748 (R.I.1984); *State v. Castore,* 435 A.2d 321, 326 (R.I.1981). Because credibility determinations are solely a jury function, a witness is not permitted to offer an opinion concerning the truthfulness of the testimony of another witness. *James,* 557 A.2d at 473; *see also State v. Tavares,* 590 A.2d 867, 870–71 (R.I.1991); *State v. Nicoletti,* 471 A.2d 613, 617 (R.I.1984). Even when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same "substantive import," such testimony is inadmissible. *See Tavares,* 590 A.2d at 870–71 (citing *Commonwealth v. Montanino,* 409 Mass. 500, 567 N.E.2d 1212 (1991)).

In *Montanino* a male defendant was found guilty on two counts of engaging in unnatural sexual intercourse with a fifteen-year-old male. The victim did not report the incidents until four years after they had occurred. At trial the victim made several statements that were inconsistent with his original report to the police. On redirect examination, the prosecutor asked the police officer who had taken the report, "And, would you tell us, Sergeant, whether or not you have an opinion as to whether in your initial discussions with victims, [you] tend to get more or less than the complete details that you eventually learn regarding the incident?" 409 Mass. at 502, 567 N.E.2d at 1213. The officer responded that in his experience interviewing sexual-assault victims, " 'most' victims eventually provided more details regarding the assault than they initially revealed." *Id.* at 502–03, 567 N.E.2d at 1213.

2. The defendant claims that two other witnesses also impermissibly vouched for Amy's credibility. We disagree with defendant's contention with respect to these two witnesses.

The defendant in *Montanino* claimed that the foregoing question and response should not have been permitted because it allowed the police officer to state his opinion that the victim was a credible witness. That is, by allowing the officer to testify that the irregularities in the victim's statements were consistent with the manner in which truthful sexual-assault victims related their experiences, the officer would be stating his opinion that the victim was a credible witness.

In reversing the defendant's conviction, the Supreme Judicial Court of Massachusetts stated, "[W]e believe that the impact on the jury of [the police officer's] observations regarding sexual assault victims had the same effect as if [the police officer] had directed his comments specifically to [the victim's] credibility. We think there is little doubt that [the police officer's] comments relating to the credibility of 'most' sexual assault victims would be taken by the jury as [the police officer's] endorsement of [the victim's] credibility." *Montanino*, 409 Mass. at 504, 567 N.E.2d at 1214. The court went on to say that "[w]hile the * * * testimony fell short of rendering an opinion on the credibility of the specific [witness] before the court, we see little difference in the final result. It would be unrealistic to allow this type of * * * testimony and then expect the jurors to ignore it when evaluating the credibility of the complaining [witness]." *Id.* (quoting *Commonwealth v. Ianello*, 401 Mass. 197, 202, 515 N.E.2d 1181, 1184 (1987)).

■ We believe that the testimony at issue in the case at bar was as prejudicial to Haslam as was the testimony in *Montanino* to the defendant in that case. In the instant case, Swink had no firsthand knowledge that Amy had been sexually molested. She did not witness any of the alleged acts of molestation. Any information acquired by Swink regarding the alleged acts of sexual abuse was obtained via conversations with other persons, particularly the complaining witness, Amy. The repeated references to "sexual abuse recovery" counseling could only impress upon the jury that Amy had indeed been sexually abused, just as Amy herself had testified, and that Swink obviously believed that Amy had been sexually abused.

This is particularly so in light of the fact that such counseling sessions had been ongoing for more than two years and Swink continued to counsel Amy at the time of trial. Although Swink's testimony that she had been counseling Amy for sexual-abuse recovery was not a literal statement of her belief in Amy's truthfulness, we believe that the testimony had the same substantive import and would be perceived by the jury as a conclusive opinion that Amy had testified truthfully. *See State v. Roderigues*, 656 A.2d 192, 194–95 (R.I.1995); *Tavares*, 590 A.2d at 870–71; *Montanino*, 409 Mass. at 504, 567 N.E.2d at 1214. Because Amy was the alleged victim and the complaining witness, her credibility was a crucial issue. The allowance of Swink's testimony that vouched for Amy's credibility was reversible error.

By August 1990 Amy, her mother, and her brother Kevin had returned to Shannock to live with Amy's grandparents. Prior to Amy's having made any allegations that defendant had sexually molested her, Haslam had made complaints to DCYF and to a social worker in the South Kingstown School Department concerning Amy's living in the same house with her grandfather and Kevin and regarding the physical conditions of the house in Shannock. The basis of the complaint with respect to the grandfather was that Amy's mother had claimed that she (Janice) had been sexually molested as a child by her father—Amy's grandfather (Janice later recanted these allegations at trial). Haslam had expressed concern that Amy was living in the same house with her grandfather in light of the allegation that the grandfather had molested his own daughter when she was a child. Haslam further expressed concern over Amy's living in the same house with Kevin. Haslam testified regarding an incident that occurred when Kevin was eight years old and Amy was six or seven years old in which Janice had caught Kevin and Amy in the garage and Kevin "had [Amy's] pants down." Although he did not witness this incident, Haslam characterized it as Kevin's sexually abusing Amy. Haslam also was concerned because Kevin had displayed violent tendencies in the past.

On September 17, 1990, Haslam called the DCYF child-abuse hot line to report Amy's living situation, and on September 19, 1990, he expressed his concerns to Melinda Matuza (Matuza), a social worker with the South Kingstown School Department. Matuza immediately called the DCYF hotline to report the allegations made by defendant. It was later that afternoon that Amy first alleged that defendant had sexually abused her. Over defense objection, the court allowed Susan Strong–Archer (Strong–Archer), a child-protective investigator with DCYF who investigated the Matuza report, to state her belief that defendant's allegations that Kevin sexually assaulted Amy when she was seven years old were "unfounded."

■ The defendant claims that Strong–Archer's testimony that the allegations he made were "unfounded" constituted an impermissible opinion by a witness that he was not credible. We agree. Whether characterized as a "conclusion," as the state insists, or as an opinion, Strong–Archer's declaration that the complaint lodged by defendant was unfounded had the effect of conveying her belief that defendant's subsequent testimony on this subject was not worthy of belief. As we have already stated, *supra*, credibility determinations are the exclusive province of the jury and a witness may not offer an opinion concerning the truthfulness of the testimony of another witness. Strong–Archer's testimony, even though it did not amount to a literal statement that she believed defendant not to be credible, had the same substantive import and its admission was error. *See Tavares, supra.* Whether the admission of Strong–Archer's testimony standing alone would constitute reversible error we do not need to decide in the total context of this appeal.

## II

On cross-examination defense counsel asked Swink if she recalled having a discussion with Amy regarding Amy's mother's being depressed and bedridden for almost one year following the birth of her youngest daughter, Susan. Swink replied that she did not recall that the word "bedridden" was used. Defense counsel subsequently ordered a partial transcript of testimony that Swink had given in an earlier Family Court proceeding and provided it to Swink for her to review. The defendant then called Swink as a witness in its own case to inquire whether her memory had been refreshed after having read the Family Court transcript concerning her discussion with Amy and the use of the word "bedridden." The defendant's questioning of Swink was confined to this subject.

■ During his cross-examination of Swink, the prosecutor asked her, "And you testified when you were here before you counseled [Amy] for sexual abuse recovery, correct?" After receiving an affirmative response the prosecutor then asked Swink, "Who did Amy say sexually abused her?" Defense counsel objected to this question on the grounds that it was beyond the scope of direct-examination and that it was hearsay that did not come within the exceptions of Rule 803 of the Rhode Island Rules of Evidence. The trial justice sustained the objection but allowed the prosecutor to engage in the following exchange with Swink:

"Q. In all your counseling with Amy, how many perpetrators of sexual abuse, without identifying them, did she tell you about, one or more than one?

"A. Only one.

"Defense counsel: Objection.

"The court: Objection. She has already responded.

"Q. Only one?

"A. Only one.

"Q. Did she ever identify [her grandfather] as someone who sexually abused her?

"Defense counsel: Objection.

"A. Nope, she didn't.

"* * *

"Q. Did she identify someone, [her grandfather] as someone who sexually abused her?

"Defense counsel: Objection.

"The court: Overruled.

"A. No, she did not.

"Q. Did she identify [Kevin] as someone who sexually abused her?

"Defense counsel: Objection.

"A. No.

"The court: Overruled.

"Q. Did she identify someone named [Peter] as somebody who sexually abused her?

"A. No.

"Defense counsel: Objection.

"The court: Overruled.

"Q. Did she use the word sexual abuse when she talked to you?

"A. Yes.

"Q. And she never mentioned [her grandfather], [Kevin] or [Peter]?

"A. Correct. Well, she mentioned, she certainly mentioned her grandfather and her brother but not as having sexually abused her."

The defendant claims that the prosecution's cross-examination of Swink impermissibly allowed her to identify defendant, by process of elimination, as the person who, according to Amy, had sexually abused her. We agree.

There had been previous testimony that Amy's mother had told two social workers that she (Janice) had been sexually molested as a child by her father (Amy's grandfather). Janice testified, however, that although she did in fact make these allegations, they were untrue. There had also been previous testimony that Kevin may have engaged in inappropriate behavior of a sexual nature with his sister Amy when Kevin was eight years old and she was seven years old. The "Peter" (not his real name) that is referred to in the above exchange is a cousin of Janice's who had stayed with her family for two weeks in 1984 at the home belonging to her parents in Shannock. Defense counsel had questioned Janice concerning whether she recalled having told a counselor that she suspected Peter of sexually abusing her sons, Alex and Kevin. Janice responded that she did not recall having made this assertion.

Previous testimony and questions propounded by defense counsel had identified four persons—defendant, Amy's grandfather, Kevin, and Peter—as persons who may have at one time engaged in inappropriate behavior of a sexual nature. Swink would not have been permitted directly to name the person who Amy had told her had sexually molested her because such an identification would have been hearsay. The effect of the colloquy between the prosecutor and Swink, however, was to establish that each person, *except defendant,* who had previously been identified as possibly having had engaged in inappropriate sexual behavior was not the person who Amy had told Swink had molested her. The result of this testimony was plainly the identification of defendant, by process of elimination, as the one and only person whom Amy had accused of molesting her.

■ The elicitation of this identification by process of elimination, when the rules of evidence prohibited Swink from directly naming the person who Amy said had molested her, was inappropriate and highly prejudicial. Swink could not testify that Amy had identified defendant during their counseling sessions as the person who had molested her even though such identification was a prior statement that is consistent with Amy's testimony at trial. *See* Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence. As the United States Supreme Court held recently in *Tome v. United States,* — U.S. —, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), a prior consistent statement made by an alleged victim of sexual abuse is not admissible as nonhearsay under Rule 801(d)(1)(B) of the Federal Rules of Evidence (which is identical to the Rhode Island rule) when the prior consistent statement was made after the motive to fabricate arose. In the instant case Amy's initial allegation that defendant had molested her was made only after defendant had made complaints to DCYF and to a school social worker regarding Amy's living situation and after Amy had aligned herself with her mother in her mother's and defendant's divorce proceedings. Because Amy's identification of defendant as her abuser occurred after the motivation to fabricate arose, the prior consistent statement did not come within the purview of Rule 801(d)(1)(B) as a statement that is not hearsay.

Any testimony by Swink that Amy had identified defendant during counseling sessions as the person who had sexually abused her would therefore have been inadmissible hearsay. The tactic employed by the prose-

cution which avoided an affirmative statement by Swink that Amy had named defendant but nevertheless allowed Swink to testify that Amy did *not* name any of the other persons who may have conceivably committed the alleged abuse amounted to a disingenuous circumvention of the rules of evidence. Even though Amy had previously testified that she had told Swink that defendant had molested her, Swink's "identification" of defendant by process of elimination was not harmless error, as the state claims. The outcome of this case hinged on whom the jury believed, Amy or defendant. As we have stated, *supra,* Swink's previous testimony that she was counseling Amy for "sexual abuse recovery" constituted impermissible vouching for Amy's credibility. Allowing this same witness, who had already vouched for Amy's credibility, to then in effect tell the jury that Amy had told her that the person who had sexually abused her was defendant was highly prejudicial and reversible error.

### III

The prosecution presented Margaret Kozel (Kozel), a pediatrician who examined Amy on September 19, 1990, the date that Amy first alleged that she had been sexually abused by defendant. Prior to conducting a physical examination, Kozel interviewed Amy for approximately forty-five minutes. The defendant claims that portions of Kozel's testimony should not have been permitted pursuant to this court's holding in *State v. Castore,* 435 A.2d 321 (R.I.1981).

In *Castore* we held that it was prejudicial error for a physician to express a factual opinion based upon information that a patient tells the physician rather than based upon the results of a physical examination of the patient or the results of laboratory tests. *Id.* at 326. We said that when a physician bases his or her medical opinion on information related to the physician by the patient rather than upon the results of a physical examination or tests, such an opinion is based on evidence that is not within the realm of the physician's medical knowledge or expertise and amounts to nothing more than the physician's assessment of the patient's credibility. *Id.*

In the instant case Kozel conducted a forty-five minute interview with Amy prior to performing a physical examination. Kozel testified on cross-examination that during her interview with Amy, she became convinced that Amy was being truthful and had formed an opinion concerning her truthfulness prior to beginning the physical examination. On direct examination, Kozel had testified that Amy had "probably" been rectally penetrated prior to September 19, 1990, when she examined the child. Defense counsel immediately objected and moved to strike this response on the ground that it was not based upon a reasonable degree of medical certainty. The objection was overruled. On cross-examination, Kozel was asked if it would have affected her opinion that Amy had been sexually penetrated rectally if she were to learn that the history Amy had given in the interview was not truthful. She responded, "I would not have been as convinced of the anal intercourse maybe." Inasmuch as Kozel testified on direct examination that Amy had "probably" been rectally penetrated, had she not relied on the truthfulness of the history related by Amy, she may have thought it less than probable that Amy had been rectally penetrated. It appears that Kozel relied to a greater extent upon the history related by Amy in concluding that she had probably been rectally penetrated than she relied upon the results of the physical examination she administered. Because Kozel's opinion appears to have been based on evidence that "was not within the realm of [her] medical capabilities or expertise * * * it amounted to nothing more than [her] assessment of the credibility" of Amy's testimony. *See Roderigues,* 656 A.2d at 194–95; *Castore,* 435 A.2d at 326. The defense objection to Kozel's testimony that Amy had probably been rectally penetrated should have been sustained, and the motion to strike should have been granted.

### IV

Amy was five months pregnant by her boyfriend at the time of trial. The prosecution made a motion in limine prior to trial to exclude evidence of the pregnancy from being presented to the jury. The de-

fendant argued that evidence of the pregnancy should be admitted for the purpose of demonstrating that Amy had a source of sexual knowledge and experience other than the alleged incidents with defendant. The motion was granted and the court refused to permit the jury to be informed that Amy was pregnant at the time of trial. The issue came up again during Amy's cross-examination, and again the court refused to permit the jury to be informed that Amy was five months pregnant. The defendant claims that the court's refusal to allow the jury to be informed that Amy was pregnant at the time of trial was prejudicial error. We agree.

On cross-examination Amy gave a detailed description of an act of oral sex that defendant had allegedly forced her to perform, including the detail that he had ejaculated in her mouth. During his closing argument the prosecutor referred back to this testimony by stating:

"[O]ne of the more dramatic moments during her testimony [was] when [defense counsel] asked her with respect to an incident, one of the incidents, with respect to the penetration of her mouth by a penis. * * * She said after a pause, 'I don't know how to explain it,' and then began to demonstrate to you by forming her hands in a particular way that I'm sure you will recall and testified that the Defendant began rubbing himself up and down with his hand. * * * And you heard her say at the end there was an ejaculation, according to her testimony, and the sperm went in her mouth. That came out on cross-examination. *Isn't that a detail that rings true that [Amy] was sexually assaulted orally?*" (Emphasis added.)

At the end of the prosecutor's closing argument defendant moved for a mistrial based upon the last comment by the prosecutor that is emphasized above. The defendant claims that this comment suggested to the jury that Amy's knowledge of oral sex could only have resulted from the alleged sexual assault when the prosecutor in fact knew that Amy had another source of sexual knowledge and experience. Moreover, not only did the prosecutor know that Amy had another source of sexual knowledge he successfully

fought to keep such information from being imparted to the jury.

In *State v. Oliveira,* 576 A.2d 111 (R.I. 1990), the defendant had been convicted of first- and second-degree child molestation. The complaining witness (referred to as Nancy) was eight years old at the time the incidents allegedly occurred and eleven years old at the time of trial. Nancy had previously made allegations of sexual abuse against two other men. The trial court held that evidence of the prior allegations of sexual abuse was inadmissible. This court held that evidence of Nancy's prior accusations of sexual abuse should have been admitted for the purpose of demonstrating that she had other sources for her knowledge of the sexual acts she had described. *Id.* at 113. We stated:

"Where the victim is a child, as in this case, the lack of sexual experience is automatically in the case without specific action by the prosecutor. A defendant therefore must be permitted to rebut the inference a jury might otherwise draw that the victim was so naive sexually that she could not have fabricated the charge." *Id.* at 114 (quoting *State v. Jacques,* 558 A.2d 706, 708 (Me.1989)).

In the instant case, Amy's pregnancy, and thus the sexual activity that resulted in the pregnancy, occurred more than three years *after* the alleged incidents of abuse occurred. The defense did not seek to show other sources of sexual knowledge for the purpose of showing that Amy fabricated the allegations against defendant. Rather its purpose was to demonstrate that *at the time she testified at trial,* Amy had another source of knowledge and experience from which she could have learned the details of the sexual acts that she described on the witness stand. Contrary to the state's contention, the fact that Amy had another source of sexual knowledge and experience at the time she testified is highly relevant, regardless of whether such other sexual conduct occurred before or after the alleged acts of sexual abuse.

In addition to describing an act of oral sex, Amy also described incidents of both vaginal and anal intercourse. It is highly relevant that at the time she testified concerning

these incidents Amy had a source of sexual knowledge, independent of any acts of alleged sexual abuse, from which she could have learned the details of the sexual acts that she described. It was therefore error to preclude defendant from informing the jury that Amy was five months pregnant at the time of trial.

## V

The defendant claims that the prosecutor was permitted to ask him unfair, irrelevant, and highly prejudicial questions during cross-examination. Specifically, defendant points to questions concerning, inter alia, whether he had fathered children out of wedlock, whether he had engaged in anal intercourse with Janice during their marriage, and whether he had told Janice that he wanted her to have an abortion when she was pregnant with Susan.

During the course of the trial a tape recording of a telephone conversation between defendant and Janice was played for the jury. On the tape, Janice referred to defendant's "other two daughters, the one down south and the one up here, the one who is an unfit mother and doesn't keep a clean house in Plum Point." It was in relation to this conversation that the prosecutor asked defendant a series of questions on cross-examination in an attempt to elicit whether he had any other biological daughters besides Lisa and Susan. It was not error to admit these questions.

On direct examination Amy testified concerning an incident wherein defendant allegedly forced her to have anal intercourse. She told defendant that his inserting his penis into her rectum hurt her. She testified that defendant responded, "[It] didn't hurt [your mother]." In light of this prior testimony, which was admitted without objection, it was permissible for the prosecutor to ask defendant on cross-examination if he had ever engaged in anal intercourse with Amy's mother.

There was no valid reason for the prosecutor to ask defendant if he had ever told Janice that he wanted her to have an abortion when she was pregnant with Susan.

The question had no relevance to any of the issues in the case and was highly prejudicial. The defendant responded to the question, answering, "I most certainly did not," before defense counsel raised an objection. Defense counsel did object after defendant had already responded but did not request that the question be stricken, nor did he request a mistrial. In the circumstances the trial justice committed no error.

## VI

The defendant claims that the trial justice committed reversible error in his instructions to the jury regarding the use of evidence of other crimes. During the trial there had been testimony that defendant had assaulted Janice while they were married and had engaged in anal intercourse with her. With respect to evidence of these acts the trial justice instructed the jury:

> "Now some of this evidence was received solely on the issue of intent, motive and/or design, and not as evidence to prove the Defendant committed the crime charged in a particular count, and I'm going to make reference to evidence for a particular count later on. And then also whatever testimony you heard relative to the acts of assaulting, etc., with individuals other than [Amy], that evidence was received solely on the issue of credibility, and evidence introduced or testimony introduced as suggested above is to be considered by you only for the limited purpose for which it was received."

At the close of the trial justice's jury instructions, defendant objected to the portion of the charge instructing that evidence was received solely on the issue of credibility, claiming that this was not a proper basis for admitting evidence of other uncharged crimes. The defendant reiterates this argument on appeal.

Generally, "evidence * * * that the accused has participated in a crime for which he or she is not on trial, even if it is the same type of crime, is irrelevant and inadmissible." *State v. Gallagher*, 654 A.2d 1206, 1210 (R.I.1995); *State v. Cardoza*, 465 A.2d 200, 202 (R.I.1983). There are several

well-established exceptions to this rule, however. Evidence of other uncharged crimes may be admissible to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident or to prove that the accused feared imminent bodily harm and that the fear was reasonable. *Gallagher*, 654 A.2d at 1210; R.I. R. Evid. 404(b). The defendant is correct in his assertion that Rule 404(b) does not state that evidence of other crimes is admissible for the purpose of assessing "credibility." *Compare* R.I. R. Evid. 609 (stating that evidence of a *conviction* of a crime may be used to attack the credibility of a witness) *with* R.I. R. Evid. 404(b). What the trial justice should have attempted to clarify is that evidence of other uncharged crimes cannot be used to establish that defendant has a propensity to commit such crimes and is therefore more likely to have committed the crime with which he is charged. *See Gallagher*, 654 A.2d at 1210; *State v. Brigham*, 638 A.2d 1043, 1044 (R.I.1994); R.I. R. Evid. 404(b). The instruction at issue gave a much broader cast than should have been given for the use of such evidence of other crimes allegedly committed by defendant.

In *State v. Jalette*, 119 R.I. 614, 382 A.2d 526 (1978), this court enumerated limited circumstances wherein evidence that the accused had committed a prior uncharged sexual offense could be admitted at his or her trial involving a subsequent alleged sexual offense. We stated, however, that evidence of other crimes must "be received 'with great caution' and is to be 'carefully restricted' by a specific instruction as to the limited purpose for which such evidence is being introduced." *Id.* at 625, 382 A.2d at 532. This is particularly so with respect to evidence of prior sexual offenses because "evidence of other sexual behavior is, by its very nature, uniquely apt to arouse the jury's hostility." *Id.* at 627, 382 A.2d at 533. "Such evidence may not be admitted merely to show a defendant's criminal propensity or lewd disposition." *State v. Lamoureux*, 623 A.2d 9, 13 (R.I. 1993).

■ The limiting instruction is one of the primary safeguards that ensures that the jury will not use evidence of prior uncharged

crimes to convict the accused on the basis of his or her bad character. *State v. Brown*, 626 A.2d 228, 234 (R.I.1993). Here, the trial justice's instruction misled the jury on a vital issue. In this case the entire outcome depended on credibility—the credibility of Amy and the credibility of the defendant. Instructing the jury that evidence of acts with persons other than Amy was to be received solely on the issue of credibility was tantamount to saying that the jury could receive and apply such evidence on the issue of guilt or innocence. Relying on this instruction, the jury could have found the defendant guilty if it believed that he had engaged in anal intercourse with his wife. (Anal intercourse is an abominable and detestable crime against nature punishable by up to twenty years' imprisonment. *See* G.L.1956 (1981 Reenactment) § 11–10–1; *State v. Santos*, 122 R.I. 799, 413 A.2d 58, 65 (1980).) The instruction was both erroneous and highly prejudicial and even standing alone would require that we grant a new trial.

For the reasons stated, the defendant's appeal is sustained and the judgment entered in the Superior Court is vacated. The papers in the case may be remanded to the Superior Court for a new trial.

BOURCIER, J., did not participate.