**STATE**

v.

**Troy LASSITER.**

**No. 99-434-C.A.**

Supreme Court of Rhode Island.

Dec. 18, 2003.

Paula Rosin, Providence, for Plaintiff.

Aaron Weisman, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

In this appeal, the defendant, Troy Lassiter (Lassiter or defendant), asks this Court to set aside his 1998 murder, conspiracy, and assault convictions based upon erroneous evidentiary rulings and order a new trial so he may introduce newly discovered evidence to support his contention that he did not commit those crimes.

### Facts and Travel

Shortly before midnight on July 18, 1996, David Andrews (Andrews) and his cousin, Andre "Bucky" Williams (Williams), were walking along West Clifford Street in an area known as "Clowntown" in Providence. As they proceeded down the street, Williams noticed a car idling at a stoplight. Concerned, Williams asked his cousin whether he knew "who that car was[.]" Andrews replied, "It ain't nobody; don't worry about it." His cousin's assurances notwithstanding, Williams continued "looking back" over his shoulder. As the vehicle slowly approached, Williams, who was standing in the street closest to the vehicle, turned to face the car. The vehicle stopped and one of the occupants shouted "[w]hats up now, mother [expletive]?" According to Williams, two guns appeared from the car windows: one from the front passenger side and the other from the rear. Almost immediately, "a lot" of "shots" were fired. Williams and Andrews dove for cover in an adjacent lot that was overgrown with high grass. When the shooting stopped, Andrews jumped up and began to run, but soon collapsed from a gunshot wound to the chest. After observing the vehicle drive away, Williams ran to where his cousin lay dying.

Detective Glen Cassidy (Det. Cassidy) of the Providence Police Department was the first officer to arrive. Williams told Det. Cassidy that he and Andrews had been fired upon by individuals driving in a maroon-colored car; he did not identify the assailants.

Approximately two hours after the shooting, Williams gave a formal statement to Detective Stephen Springer (Det. Springer) of the Providence Police Department. Williams told Det. Springer that he "tried to look into the car to see who was in it, but all [he saw] was fire * * *." Although he believed that there were four people in the car, Williams said that he was unable to identify them. He described the car as cranberry in color, with a gray bottom, believing it to be a Ford Taurus.

On the next Monday, Williams returned to the Providence police station and changed his original statement. He told Detective Robert Muir (Det. Muir), "I know who was in the car. I been knowed who was in the car. I was afraid to tell you the night it happened." According to Williams, "my grandmother wanted me to go down there and tell [who was in the car]." He identified three of the subjects as Lassiter, Derick Hazard (Hazard), and

David Roberts (Roberts),[1] but he was unable to identify the driver. Williams said that Hazard and Lassiter were the trigger men, that Hazard sat in the front passenger seat and Lassiter sat behind him. He described Lassiter's gun as "louder," with "more fire coming out of it." Williams then identified Lassiter, Hazard, and Roberts from a set of photographs shown to him by Det. Muir. Because Williams provided inconsistent statements to the police, the reliability of his eyewitness testimony became the central issue at trial.

The defendant, along with Hazard and Roberts, was charged with first-degree murder of Andrews, conspiracy to murder Andrews, assault with intent to murder Williams, and conspiracy to assault Williams with intent to murder. Lassiter's case was severed from that of his codefendants and he proceeded to trial in September 1998.[2] The jury failed to reach a verdict and a mistrial was declared.

Lassiter was retried before a second jury on November 4, 1998. Besides Williams and the police witnesses, the state presented several witnesses to support its case. William Williams (Bill Bill) testified that he, Andrews, and Williams were together the evening of the murder. Bill Bill said that just before the shooting, he left Andrews and Williams at the corner of Lockwood and West Clifford Streets and started back toward his home a few blocks away. As he walked, he noticed a cranberry Taurus drive past him and turn onto West Clifford Street. A few moments later, he heard gunshots and ran outside to find Andrews collapsed and bleeding.

Detective Robert Badessa (Det. Badessa) also testified for the state. He stated that he was dispatched to the scene the night of the murder and recovered spent cartridge casings on the ground at the corner of West Clifford and Pearl Streets. Four of the cartridge casings were from a .22–caliber gun, and four were from a .45–caliber gun. He also discovered a shell jacket from a .45–caliber bullet. Detective Badessa testified that a .45–caliber weapon would have a much louder report than a .22–caliber weapon and that the difference would be discernible to the average person. Detective Badessa thought that the two bullet wounds Andrews suffered probably were caused by a .45–caliber firearm because of the size of the bullet wounds.

Wraina Dale (Wraina), Andrews's girlfriend of two years and the mother of his child, testified over defense objection that although there were no problems between Andrews and defendant, "problems" existed between "the Lockwood" section of Providence, the decedent's neighborhood, and "the Lassiters." She also testified, again over defense objection, to statements purportedly made by Andrews before his death that implicated Lassiter's codefendants in previous criminal acts, but not Lassiter. In one series of statements two weeks before the murder, Andrews described being shot at by four individuals, including Hazard, Dennis Marrow,

---

1. Williams originally identified the man in the rear driver's side seat as David Lassiter instead of David Roberts. However, both names belong to the same person, legally named David Roberts but also known as David Lassiter.

2. Hazard and Roberts stood trial together in the summer of 1998. The first proceeding abruptly ended in a mistrial on July 24, 1998.

After the state closed its case at the second trial, the trial justice granted Roberts's motion for judgment of acquittal. Hazard was convicted on all counts, except the charge of conspiracy to assault Williams with intent to murder. Hazard's appeal from his conviction and the denial of a post-sentencing motion for a new trial was denied by this Court in *State v. Hazard*, 797 A.2d 448 (R.I.2002).

"Darky," and Lamont Lee. Additionally, Wraina recounted a discussion with Andrews "a long time before then" that he was "stuck * * * up" by Roberts, who stole his bike and money.

The state's chief medical examiner, Elizabeth Laposata, M.D. (Dr. Laposata), testified to an autopsy she performed on Andrews. She said that Andrews had two gunshot wounds to his body, possibly resulting from the same bullet. The fatal wound traveled through his chest, including his lungs and heart, causing Andrews to bleed to death. Doctor Laposata also said that it was possible for Andrews to have suffered the chest wound and to have continued running some distance before collapsing from his injuries. She testified that the chest wound was the result of large-caliber bullet, either a .38 or a .45.

The defendant maintained throughout trial that Williams mistakenly identified him as one of the assailants in the vehicle. Lassiter presented the defense of alibi, supported by one witness, his aunt Bernita Ann Wilkins (Wilkins), who testified that Lassiter was at her house from 10 p.m. to 10:50 p.m. and 11:05 p.m. to midnight on the night of the murder. At 10:50 p.m., Lassiter left her house to buy alcoholic beverages, returning some fifteen minutes later with a six-pack of beer. According to Wilkins, Lassiter was with her at her home at the time the shooting took place.

At the close of the state's case, Lassiter's motion for a judgment of acquittal was denied. The jury rejected Lassiter's alibi testimony and found Lassiter guilty of murder, conspiracy to commit murder, and assault with intent to murder Williams.[3] Lassiter subsequently filed a motion for a new trial, which was denied on December 4, 1998. On January 8, 1999, the trial justice imposed a mandatory sentence of life imprisonment at the Adult Correctional Institutions for the murder conviction, ten years for conspiracy, and twenty years for assault with intent to murder. These sentences were ordered to run concurrently. A judgment of conviction entered on January 8, 1999. Lassiter filed notice of an appeal the same day.

On June 22, 2000, this Court issued an order remanding the case to Superior Court for a motion for a new trial based upon newly discovered evidence. A hearing on Lassiter's new trial motion was held on August 8 and 24, 2001. After two days of testimony, the hearing justice ruled that the evidence presented was insufficient to warrant a new trial. This appeal followed.

We address below only those issues that we find to be dispositive.

## I

### "The Lockwood and the Lassiters"

Wraina, the decedent's girlfriend of two years and the mother of his child, testified at trial that there were "problems" between "the Lockwood" section of Providence and "the Lassiters," but there were no problems between Andrews and the Lassiter on trial. The defendant objected to this testimony and moved to pass the case on two grounds. First, he argued that he was surprised by this testimony and that it constituted a discovery violation, and second, that the evidence was otherwise inadmissible against him. The trial justice denied the motion to pass and instead issued a cautionary instruction to the jury.

■ Turning to Lassiters's contention that Wraina's reference to trouble between "the Lockwood and the Lassiters" evi-

---

**3.** Because both Hazard and Roberts were acquitted of conspiracy to assault Williams with intent to murder, that charge had been dismissed with respect to Lassiter.

denced a violation of Rule 16(a)(8) of the Superior Court Rules of Criminal Procedure, the state provided defendant with an extensive summary of Wraina's expected testimony. Rule 16 obligates the state to provide defendant with "a summary" of a witness's "expected" testimony. It is apparent from the record that the state was not trying to elicit impermissible testimony, but rather had explicitly questioned Wraina whether she was "aware of any problems between the defendant and [Andrews]." Although Wraina's response exceeded the scope of the prosecutor's inquiry, this does not, in and of itself, establish a discovery violation. We are satisfied, however, that this evidence was nonetheless inadmissible.

 Given Wraina's statement that she was unaware of any problem between defendant and Andrews, her subsequent testimony that there was trouble between "the Lockwood" neighborhood and "the Lassiters" was irrelevant and prejudicial. Evidence of the type at issue here is admissible only if the prosecution demonstrates that the defendant is a member of a certain group, and that there was a direct connection between the defendant's membership in that group and the crimes for which the defendant is charged. *See State v. Phillips,* 128 N.M. 777, 999 P.2d 421, 428 (Ct.App.2000) (stating that evidence of wrongdoing by third parties may be admitted only to demonstrate the background of a crime when there is a "direct link" between the evidence and the particular charge against the accused). Unless a direct connection is made linking the defendant, the group, and the alleged activity of that group, the probative value of any evidence concerning that group's activities probably will be substantially outweighed by its prejudicial effect. *Denmark v. State,* 646 So.2d 754, 757 (Fla.Dist. Ct.App.1994).

Here, not only did the state fail to establish that either Lassiter or Andrews were members of the groups about which Wraina testified, the membership and the nature of the "problems" between those groups also was a mystery. By permitting a witness to opine that there were problems between "the Lockwood and the Lassiters," the jury was left to infer any manner of nefarious association or motive to defendant, none of it shown by the state to be relevant to the specific crimes charged. This evidence is particularly troublesome because the witness stated that there were problems between the decedent's neighborhood, "the Lockwood," and "the Lassiters," a group that bears the same name as defendant. A logical inference to be drawn from this statement is that defendant is linked to the Lassiters and therefore there was bad blood between the decedent and him.

 We must now determine whether the trial justice abused his discretion in refusing to pass the case in light of Wraina's testimony. *See State v. Bolduc,* 822 A.2d 184, 186 (R.I.2003) (per curiam). Not all potentially prejudicial statements made during trial require the trial justice to declare a mistrial. *Id.* In this situation, the trial justice's duty was to assess the prejudicial impact of the comment and determine whether the prejudice was so ineradicable that the motion to pass must be granted. *State v. McDonald,* 602 A.2d 923, 927 (R.I.1992). If the prejudice was curable, the trial justice was obliged to issue a timely and effective instruction to the jury. *Id.*

We are convinced that the trial justice appropriately mitigated any prejudice caused by the admission of this testimony. The trial justice instructed the jurors that they could not properly consider Wraina's testimony about "the Lockwood and the

Lassiters" when assessing the defendant's guilt. He said:

> "The offense charged relates to three people: Derick Hazard, David Lassiter, Troy Lassiter; that they agreed, they conspired to commit an illegal act. They are not responsible for somebody else's feelings. This defendant doesn't have the—doesn't have to defend any charges or any ill will by others who happen to come from Lockwood [Street]. He must defend and the State must prove beyond a reasonable doubt the elements of the offense of conspiracy to commit murder."

We are satisfied that this curative instruction, which was given contemporaneously with Wraina's testimony, *State v. Jackson,* 752 A.2d 5, 11 (R.I.2000), was sufficient to foreclose the possibility that the jury was prejudiced by this testimony. Accordingly, although Wraina's statement constituted error, the contemporaneous instruction rendered it harmless beyond a reasonable doubt.

## II

### Declarations of Decedent Made in Good Faith

■ Wraina also testified at trial concerning two statements Andrews made before he died. She testified that about two weeks before July 18, 1996, Andrews came to her house with Band–Aids on his left knee and told her that while he and a friend were walking from Elmwood Avenue towards Lockwood, four young men shot at "him." Andrews purportedly identified the assailants as Hazard, Dennis Marrow, Lamont Lee and someone she referred to as "Darky." Wraina also testified that on another occasion, "a long time before" the fatal shooting in 1996, Andrews told her that Roberts had robbed him and stolen his bicycle.

■ The trial justice ruled that Wraina's testimony concerning Andrews's previous statements was admissible pursuant to Rule 804(c) of the Rhode Island Rules of Evidence. Rule 804(c) provides that "[a] declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant." We previously have held that Rule 804(c) applies in criminal as well as civil cases. *See State v. Burke,* 574 A.2d 1217, 1222 (R.I.1990) (citing advisory committee's note to Rule 804(c)). However, because Rule 804(c) is not a "firmly-rooted hearsay exception," out-of-court statements may be admitted into evidence only if they possess adequate "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *State v. Lynch,* 770 A.2d 840, 847 (R.I. 2001); *Burke,* 574 A.2d at 1223.

Lassiter argues on appeal that Wraina's testimony concerning Andrews's disclosures was inadmissible hearsay because his statements did not bear the requisite indicia of reliability. In *Burke,* 574 A.2d at 1223, we affirmed the trial court's admission of a decedent's prior statements largely because the court held a *voir dire* hearing and made specific findings of reliability before the statements were ruled admissible. Lassiter contends that the failure of the trial justice to specifically find that each of Andrews's prior statements possessed sufficient indicia of reliability constituted reversible error.

Although we agree that the trial justice failed to make the prerequisite findings of reliability, after a careful review of the record, we conclude that this argument was not properly preserved for appellate review. The proposed introduction of these statements was discussed extensively at sidebar between the trial justice and

counsel. The trial justice explicitly stated that Wraina's testimony "would have to come in * * * as a declaration of a deceased person * * *." The record discloses that counsel for defendant failed to express *any* hearsay-based objection to the admissibility of the proposed evidence during that sidebar or at any point thereafter. The only objection posited by defense counsel concerned the relevancy of this evidence in the context of co-conspirator liability. After the sidebar conference defense counsel made a general objection to Wraina's testimony. Considering the previous extensive discussion of the proposed admissibility of Wraina's testimony, Lassiter's general objection was insufficient to preserve his hearsay-based contention on appeal. *See* R.I.R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected, and * * * [i]n case the ruling is one admitting evidence, a timely objection * * * appears of record, *stating the specific ground of objection*, if the specific ground was not apparent from the context") (emphasis added); *State v. Bettencourt*, 723 A.2d 1101, 1107, 1108 (R.I.1999) (citing R.I.R. Evid. 103(a)(1) to hold that "defense counsel asserted a general rather than a specific objection at trial [and] * * * therefore, the objection has not been preserved for appeal"); *State v. Toole*, 640 A.2d 965, 972 (R.I.1994) (same); *see also State v. Neri*, 593 A.2d 953, 956 (R.I.1991) ("when * * * the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may not be raised for the first time on appeal"). We therefore decline to pass upon defendant's hearsay-based assignment of error.

---

**4.** Wraina's testimony concerning the prior bad acts of Roberts and Hazard was excluded from the Roberts and Hazard trial pursuant to motions *in limine* filed by those defendants.

## III

### Relevancy of Andrews's Prior Statements

■ Although Lassiter may not have preserved an appropriate hearsay objection to the admission of Andrews's out-of-court statements to Wraina, his relevancy-based objection was properly raised and preserved.[4] The defendant argues on appeal that Wraina's testimony was irrelevant to establish that he engaged in a conspiracy to murder the decedent, and thus the introduction of this testimony constituted prejudicial error.

■ Conspiracy is an agreement by "two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *State v. Mastracchio*, 612 A.2d 698, 706 (R.I.1992). Once an agreement has been made, no further action in furtherance of the conspiracy is necessary to find a defendant guilty of the crime of conspiracy. *State v. Romano*, 456 A.2d 746, 757 (R.I.1983). The state must prove the existence and scope of the conspiracy charged beyond a reasonable doubt. *Mastracchio*, 612 A.2d at 706. We previously have recognized that there seldom will be direct evidence of an explicit agreement to commit an unlawful act, and that the existence and scope of a conspiracy often must be "inferentially established by proof of the relations, conduct, circumstances, and actions of the parties." *Id.* (quoting *State v. Gordon*, 508 A.2d 1339, 1349 (R.I.1986)).

Here, the trial justice decided that the prior statements of the decedent were admissible to prove conspiracy. The trial

---

Although Lassiter did not file a pretrial motion to exclude Wraina's testimony, he did object to the introduction of this testimony at trial.

justice stated the basis of his ruling as follows:

> "[Hazard] is present in the car * * * if there was bad blood between Hazard [and Andrews] because of a prior incident and [Hazard] is using one of the weapons, that is some evidence that tends to prove a conspiracy. I don't think [the defendant] has to be named. He's there participating, and if there is bad blood among one of the co-conspirators, I think that's amply sufficient."

We fail to see how either incident circumstantially establishes the existence of a conspiracy to murder Andrews or that defendant was part of that conspiracy. Wraina's testimony amounted to evidence of prior uncharged criminal conduct on the part of the codefendants, one of whom had been acquitted in a prior proceeding. The general rule concerning the inadmissibility in criminal prosecutions of evidence of other bad acts to prove that an individual acted in conformity therewith does not bar such evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident * * *." R.I.R. Evid. 404(b). Contrary to the trial justice's ruling, testimony that a codefendant robbed the victim of his bicycle some indeterminate period of time—possibly *years*—in the past, does not prove any of the elements set forth in Rule 404(b), and therefore does nothing to support the state's contention that Lassiter engaged in conspiracy to murder Andrews.

The state also fails to demonstrate the admissibility of Andrews's statements to Wraina that he was shot at by a group of men that included Hazard, but not Lassiter. It appears from Wraina's testimony that Hazard was not actually shooting at Andrews but was in fact shooting Andrews's *companion*, who, according to Wraina, previously had tried to run the mother of Hazard's child off the road. As

noted, the trial justice ruled that this testimony was relevant on the issue of the existence of a conspiracy because "there is bad blood among one of the coconspirators." This holding overlooks the fact that Hazard was among a group of assailants who apparently were firing at someone other than the decedent, suggesting that Hazard's animus was not aimed at Andrews.

Furthermore, these prior bad acts also fail to establish that the scope of the alleged conspiracy included Lassiter. Critically, neither Roberts's nor Hazard's alleged misconduct involved or implicated Lassiter in any way. The state presented no evidence that Lassiter even was aware that these acts had transpired. *See People v. Harris,* 892 P.2d 378, 382 (Col.Ct.App. 1994) (evidence of companion's previous offense admissible to show conspiracy because defendant's knowledge and awareness of prior crime proved whether there was an agreement to engage in the commission of the crime charged); *see also State v. Porto,* 591 A.2d 791, 796 (R.I.1991) (holding that " 'one does not become part of a conspiracy by aiding and abetting it * * * unless he knows of the conspiracy' "). It is the state's burden to prove the existence and scope of the conspiracy agreement. *Romano,* 456 A.2d at 757 (citing *State v. Ahmadjian,* 438 A.2d 1070, 1084–85 (R.I.1981)). The state failed to demonstrate a sufficient nexus between these prior acts and Lassiter to support its contention that Wraina's testimony was probative of the conspiracy charge against him.

The state also suggests on appeal an alternative ground of admissibility, arguing simply that Wraina's testimony was relevant because if Lassiter's codefendants previously had harmed Andrews, that fact had a "tendency to make the veracity of Williams's identification more probable

than it would be without such evidence." The state completely fails, however, to explain *how* this testimony corroborates Williams's identification of either the coconspirators or, more importantly, Lassiter himself. Importantly, even if we agreed with the state's contention that Roberts's and Hazard's prior bad acts made it more likely that Williams correctly identified *them* as the assailants, this premise has no relevance to Williams's identification of Lassiter. As we have noted, the state failed to produce any proof that Lassiter knew of these previous crimes against the victim or was part of an unlawful conspiracy at the time they were committed. Without connecting these acts to Lassiter or showing that he was aware of them, *see Porto*, 591 A.2d at 796, the state's contention that they made it more likely that Lassiter was correctly identified is without merit.

 We are mindful that the alleged shooting and robbery by the coconspirators, as testified to by Wraina, amounted to uncharged criminal conduct that was not introduced against Lassiter to establish his vicarious liability for those crimes. We are satisfied, however, that even if this evidence was offered to prove vicarious liability, it was nonetheless inadmissible. A coconspirator is only vicariously liable for the actions of another coconspirator if those actions were committed in furtherance of an *existing* conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *State v. Oliveira*, 774 A.2d 893, 919 (R.I.2001). The state offered no evidence that a conspiracy existed at the time of these incidents or that Roberts or Hazard were acting in furtherance of that conspiracy. In fact, the state offered no evidence whatsoever concerning the genesis of these crimes. Accordingly, even if presented as evidence of vicarious liabili-

ty, the state simply has not shown enough to warrant the admission of Wraina's testimony. *See Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (citing Fed.R.Evid. 801(d)(2)(E) for the proposition that statements of a coconspirator are admissible only if made in furtherance of an *existing* conspiracy) (emphasis added); *State v. Patriarca*, 112 R.I. 14, 40, 308 A.2d 300, 316 (1973).

"We, like the federal courts, tend to look with disfavor on attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecution." *Porto*, 591 A.2d at 796 (quoting *Patriarca*, 112 R.I. at 40, 308 A.2d at 316). We are of the opinion that Wraina's testimony concerning the prior bad acts of Roberts and Hazard was not relevant. Moreover, even if the state established threshold relevancy for this evidence, its negligible probative value was substantially outweighed by its potential prejudicial effect. R.I.R. Evid. 403. Accordingly, the admission of the decedent's statements to Wraina was error.

## IV

### Detective Springer's Testimony

 The defendant assigns error to the admission of opinion testimony by Det. Springer that he believed that the state's only eyewitness was not truthful when he told Det. Springer that he could not identify the individuals in the vehicle. The defendant argues that the trial justice erred in permitting Det. Springer to give an opinion that Williams, in fact, knew the identity of his assailants when he gave his first statement shortly after the murder. Lassiter contends that Det. Springer impermissibly "bolstered" the testimony of Williams by opining that, notwithstanding Williams's statement that he was unable to identify the shooters, he believed that Williams was "withholding that informa-

tion," thus implying that Williams, in fact, knew the identity of the shooters. Detective Springer was permitted to explain the basis of that belief as follows:

> "[Williams] was very specific as to what happened as he was walking down the street and what he saw approach. When it came to the point that I tried to be specific as to the faces in the car or the people in the car, he became vague at that point and all he would give was a black face. I felt basically at the distance he was away from the car and his opportunity to view who was in the car, *I felt he was not completely honest at that point when he told me all he saw was a black face.*" (Emphasis added.)

In ruling this evidence admissible, the trial justice declared that Det. Springer was "entitled to render his opinion concerning his present state of mind at the time he took this statement." Lassiter contends that the admission of this testimony had the effect of "vouching" for the witness's credibility on the crucial issue of Williams's identification of defendant as one of the shooters. According to Lassiter, the admission of Det. Springer's opinion testimony that Williams was "not completely honest" when he first told the police that he was unable to identify the shooters implied that Williams *was* being honest when he gave the second statement in which he named Lassiter as one of the gunmen. Thus, defendant contends that Det. Springer not only expressed his belief that the witness's first statement was untruthful, but he also explained why he "felt [the witness] was not completely honest * * *." The vouching was particularly prejudicial here, Lassiter argues, because Williams was the only witness to identify the shooters at trial, and the vouching was accomplished by an experienced police detective. Further, because Williams's credibility in the eyes of the jury on that point probably was

dispositive of the charges against defendant, Lassiter contends that such impermissible vouching amounted to reversible error. In light of our previous holdings condemning this practice, we are constrained to agree.

■■■■■ "The determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *State v. Webber*, 716 A.2d 738, 742 (R.I. 1998) (quoting *State v. Haslam*, 663 A.2d 902, 905 (R.I.1995)). "Bolstering" or "vouching" occurs when one witness "offer[s] an opinion regarding the truthfulness or accuracy of another witness' testimony." *Id.* Impermissible bolstering may occur even if the witness does not literally state an opinion concerning the credibility of another witness's testimony. *Id.*; *Commonwealth v. Montanino*, 409 Mass. 500, 567 N.E.2d 1212, 1214 (1991). If one witness's testimony has the same "substantive import" as if it addressed another witness's credibility, it is inadmissible. *Webber*, 716 A.2d at 742.

In *State v. Miller*, 679 A.2d 867 (R.I. 1996), a college coach was charged with sexually assaulting one of his players. One assault allegedly took place in 1990, the other in 1991. *Id.* at 869. The complainant did not report the alleged assaults to the police in a timely fashion, but testified at trial that she disclosed the first assault to her mother the summer after it happened and did not identify her assailant. *Id.* at 872. A year later, when the mother spoke with a police officer, she failed to mention her daughter's prior disclosure. *Id.*

Over defendant's objection at trial, the police officer was permitted to testify, first, that it was not uncommon for the police to have to draw out important information from witnesses, and second, that witnesses often fail to appreciate the im-

portance of the information they possess when they first speak to the police because information that may not "seem that important to them could be very important for me to know." *Miller*, 679 A.2d at 872. This Court deemed the officer's testimony impermissible vouching because it suggested that the witness's failure to mention the first assault "should not be viewed as adversely affecting her credibility." *Id.* We reiterated that the "[d]etermination of the truthfulness or the credibility of witnesses is the exclusive province of a jury." *Id.* "A witness is therefore not permitted to offer an opinion concerning the truthfulness of the testimony of another witness, even when the opinion given does not literally address another witness's credibility." *Id.* (citing *Haslam*, 663 A.2d at 905).

Although Det. Springer's testimony was not a literal comment on the truthfulness of Williams's *in-court* testimony that Lassiter was one of the gunmen, the detective was permitted to give an opinion concerning Williams's *initial veracity*. The effect of this testimony was to inform the jury that Det. Springer believed that Williams could identify his assailants and, therefore, that Williams's subsequent statement disclosing their identity was, in fact, worthy of belief. Further, Springer was permitted to testify about the basis of his opinion: that because Williams spoke with specificity about the events leading up to the shooting and the short distance between Williams and the vehicle, he "felt that [Williams] was not completely honest * * * when he told me all he saw was a black face." This opinion testimony undoubtedly bolstered the state's *primary contention* that Williams was being honest when he identified Lassiter as one of the gunmen in his second police statement and during his in-court testimony. *See In re Jessica C.*, 690 A.2d 1357, 1362–63 (R.I. 1997) (holding statement by witness that a

child's allegations of abuse "came across as very credible" amounted to vouching).

This case is also similar to *Webber*. In that case, Matty, a police dog trained to detect the presence of flammable accelerants, was used during a search of defendant's motor vehicle. *Webber*, 716 A.2d at 739–40. John B. Fiore (Fiore), a Rhode Island State fire marshal investigator, was permitted to testify that a member of the Connecticut State Police and his dog, Matty, assisted in an arson investigation at defendant's home. *Id.* Neither the trainer nor the curator of the dog testified and the state failed to offer any evidence concerning the dog's training. *Id.* at 740–41.

According to Fiore, Matty "alerted" to the presence of a flammable accelerant in the vehicle's floor mat. *Id.* at 739–40. The floor mat was seized and subsequently tested utilizing gas chromatograph technology at the Rhode Island State Crime Laboratory. That test did not detect any flammable accelerant on the mat. *Id.* at 740. However, the state called Thomas Haynes, a certified fire marshal in Rhode Island and Connecticut, who testified as an expert witness. When questioned concerning the results of tests comparing the relative sensitivity of trained dogs and gas chromatographs to the presence of flammable substances, Haynes testified that studies demonstrated that canines were more sensitive than gas chromatographs at detecting the presence of "weak samples." *Id.* at 742. The jury, which had been presented with two pieces of conflicting, yet highly probative evidence—the presence or absence of a flammable substance in defendant's vehicle—was thus aided in determining the credibility of this evidence by expert witness opinion that dogs were more accurate at detecting weak samples of accelerants. We ruled that this testimony impermissibly bolstered the evidence concerning Matty's alert to the presence of

an accelerant by vouching for the accuracy of the dog's response. *Id.*

We are satisfied that as in *Miller* and *Webber,* the state presented the testimony of Det. Springer to explain away damaging evidence by suggesting that Williams's initial statement that he was unable to identify the shooters should not be viewed as adversely affecting his credibility. That is, because Det. Springer believed that Williams knew the identity of his assailants when he gave the first statement, the jury should too. We are thus satisfied that Det. Springer's opinion testimony constituted impermissible vouching because "it squarely addressed and bolstered another witness's credibility." *Miller,* 679 A.2d at 872. Because Det. Springer's testimony supported the credibility of the state's only eyewitness, its admission could be construed by the jury only as an endorsement of the witness's credibility. *Id.* at 873.

Opinion evidence that tends to corroborate another witness's testimony or substantiate a disputed fact is admissible in limited circumstances. In *State v. Gough,* 810 A.2d 783, 786 (R.I.2002) (per curiam), the admission of testimony by the investigating officer that the marks he observed on the complainant's wrists were consistent with the improper use of handcuffs was upheld by this Court. We rejected the argument that this evidence constituted bolstering. Although the officer's opinion corroborated the complainant's testimony that handcuffs had been employed to restrain him, a photograph depicting the circular marks on the complainant's wrists was also admitted into evidence. *Id.* The jury was thus provided with enough "facts upon which the officer's opinion was based to assess whether the conclusions drawn possessed sufficient probative force or, rather, were grounded in mere speculation or conjecture." *Id.* In the case at bar,

Det. Springer's testimony was not based on objectively manifested observations. Rather, he simply stated his belief and the basis of that belief that Williams was not being truthful when he said that he was unable to identify the gunmen. This testimony was not based on any objectively measurable criteria, such as physical injury, but on his instincts and assumptions as an experienced officer.

In this case, because Williams was the key prosecution witness, his credibility was of paramount importance. *Montanino,* 567 N.E.2d at 1214. His contradictory statements to the police concerning his ability to identify the gunmen had placed his credibility in question and afforded defendant fruitful grounds for cross-examination. Because the state's case against Lassiter depended on Williams's credibility, Det. Springer's opinion that the witness knew the identity of the assailants all along probably was accorded great weight by the jury. *Miller,* 679 A.2d at 873; *see also State v. Desmarais,* 479 A.2d 745, 748 (R.I.1984) (acknowledging influential nature of police testimony). Accordingly we conclude that the improper introduction of testimony bearing on Williams's credibility was prejudicial error warranting reversal of the conviction.

### Conclusion

For the reasons set forth herein, the judgment is vacated and the case is remanded to the Superior Court for a new trial.

FLANDERS, Justice, dissenting.

I respectfully dissent from the reasoning of the Court in deciding to vacate the judgments of conviction against the defendant, Troy Lassiter (Lassiter), and to remand this case for a new trial. I would affirm the convictions for the following reasons:

(1) *Relevancy of the Victim's Statements about the Other Shooters Who Were in the Car with the Defendant.* The out-of-court statements that the victim, David Andrews (Andrews), supposedly communicated to his girlfriend, Wraina Dale, were relevant to show why Hazard and Roberts—the other shooters who were in the car with Lassiter when the murder occurred—might have had a motive and plan to shoot Andrews to death on the date he was murdered.

"Decisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice; this Court will not disturb those decisions on appeal absent an abuse of discretion." *State v. Pena–Rojas,* 822 A.2d 921, 924 (R.I.2003) (per curiam) (citing *State v. Botelho,* 753 A.2d 343, 350 (R.I.2000)). Moreover, "when reviewing such decisions, we will not conclude that a trial justice abused his or her discretion as long as some grounds to support the decision appear in the record." *Id.* (citing *Botelho,* 753 A.2d at 350).

Here, there were "some grounds" supporting the trial justice's decision that Andrews's out-of-court statements were relevant to show that Hazard and Roberts had a motive to kill Andrews. Williams identified Hazard and Roberts as being in the same car as Lassiter when the shooting occurred. Andrews's statements to his girlfriend were relevant because they tended to explain why these two individuals might have been in the car shooting at Andrews. As the trial justice concluded, if those statements were true, then they provided some indication of prior "bad blood" between Andrews and these two individuals.[5] Consequently, such circumstances were relevant to show that they still may have wanted to hurt Andrews, as they apparently had attempted to do in the past. And given that Lassiter grew up with Hazard and that Roberts was Lassiter's cousin, such evidence also helped to explain why Lassiter may have been with these other two people in the car, as well as revealing why all of them may have been doing what Williams said they were doing. Thus, the evidence was relevant because it corroborated Williams's testimony and helped to explain why the individuals in the car may have been shooting at Andrews. Moreover, if Williams identified Hazard and Roberts correctly, and placed them in the car with Lassiter—who was a lifelong friend and cousin, respectively— then this evidence also tended to corroborate Williams's identification of Lassiter as well ("the enemy of my friend is also my enemy").

In any event, I do not believe the jurors would have convicted Lassiter merely because they thought ill of him when they heard the evidence concerning his coconspirators' prior bad acts towards their victim. Indeed, Lassiter's own attorney apparently thought so little of this evidence that he weighed the possibility of not even objecting to it ("if it comes out * * * maybe I won't [object]"). Also, the trial justice instructed the jury at the close of all the evidence that "[t]he only person who is on trial before this jury is Troy Lassiter," and that "[h]e is the only one that is a defendant in this case * * * [and]

---

**5.** The majority states that the girlfriend's testimony indicated that "Hazard was not actually shooting at Andrews but was in fact shooting Andrews's *companion* * * * suggesting that Hazard's animus was not aimed at Andrews." But this interpretation of the previous shooting incident overlooks the possibility that Hazard may have resented the fact that Andrews was hanging out with the person who had attempted to run the mother of Hazard's child off the road and who then witnessed Hazard's attempts to murder that individual, thereby giving Hazard a motive to kill Andrews.

whose guilt or innocence you are concerned with."

Accordingly, the admission of the challenged evidence, even if it had constituted error because it was irrelevant, was not unfairly prejudicial to Lassiter and did not constitute reversible error. Such decisions should not be overturned on appeal unless no grounds to support the decision appear in the record. *Pena–Rojas*, 822 A.2d at 924. In my judgment, and for the reasons previously stated, there are indeed "some grounds" in the record to support the admission of this evidence.

(2) *Allowing Police Det. Springer to Testify that the Eyewitness, Williams, Was "Not Completely Honest" when He First Spoke with the Police Did Not Bolster Williams's Credibility.* I also do not believe that the trial justice committed reversible error in allowing Det. Springer to testify that Williams, in his opinion, was "not completely honest" when he initially told the detective that all he could see was a "black face" in the shooters' car. It is difficult for me to accept the proposition that when a witness testifies that he believes that a person was "not completely honest" with him, he is thereby bolstering that person's credibility when the individual in question later testifies at trial to a contrary version of the same events.

I also do not agree that when Det. Springer testified that, in his judgment, Williams was "not completely honest" when Williams initially told him that he was unable to identify the shooters, this testimony implied that Williams was being truthful when Williams changed his story and later named Lassiter as one of the gunmen.

First, as previously noted, it does not usually enhance one's credibility in the eyes of others by pointing out that he or she was untruthful about the same subject matter on one or more previous occasions.

Characterizing someone as "not completely honest" is scarcely a way of bolstering his or her credibility when he or she later testifies under oath on the same subject matter.

Second, Det. Springer never said anything about whether Williams was telling the truth when he gave his second statement to the police in which he named Lassiter as one of the gunmen. Although Det. Springer's testimony that he thought Williams was "not completely honest" also indicated that, during their initial conversation, the detective believed that Williams knew who the gunmen were, this evidence did not imply that Williams's later statement that Lassiter was one of the gunmen was truthful. If Williams was "not completely honest" when he first spoke to Det. Springer, then why would the jury believe that Williams was necessarily telling the truth when he later purported to identify Lassiter as one of the gunmen? Even though Det. Springer believed that Williams could identify the shooters, such a statement does not imply that Williams's later statement to the police, or his testimony at trial in which he identified who the assailants were, was in fact worthy of belief. After all, Williams could have known full well who the shooters were, but deliberately lied yet again—just as he had done when he first spoke to Det. Springer—by falsely identifying the people he named to the police. In any event, the crucial point is that Det. Springer never said anything about whether Williams was telling the truth when he later fingered Lassiter as one of the shooters.

Third, even without Det. Springer's testimony, the jury would have heard that Williams had provided inconsistent statements to the police, denying at first that he knew who the shooters were, and then later contradicting himself and identifying them. Given the fact that the police

charged Lassiter with murder, and the relative lack of evidence to corroborate the later version of Williams's eyewitness account, the jury would have known that the police chose to believe Williams's later statement to them, rather than his first one. Thus, the notion that Det. Springer, and for that matter every other police officer on this case, thought that Williams was not telling the truth when he initially said that he could not identify the shooters was hardly earthshaking news to the jury, especially given the police involvement in obtaining the indictment of these defendants. For these reasons, even if it was error for the trial justice to allow Det. Springer to state his opinion about Williams's "not being completely honest" when they first spoke, I do not believe it amounted to reversible error because the jury would have known, in any event, that the police did not believe Williams's initial statement to Det. Springer. The defense's failure to request a limiting instruction or to move for a mistrial when the trial justice allowed this evidence to be admitted also suggests that it did not view this evidence as unduly prejudicial. *See State v. Brown*, 709 A.2d 465, 477 (R.I.1998).

Fourth, the evidence was not offered to bolster the credibility of Williams's identification of Lassiter as one of the shooters but as proof of Det. Springer's state of mind to show why he intended to pursue further questioning of Williams. In doing so, the state intended to counter the anticipated defense that the police had coerced Williams into changing his story by suggesting that this was just good police work in following up with a witness who was reluctant at first to get involved in identifying the shooters and, therefore, initially lied to the police about whether he could identify them.

Finally, unlike the situations in *State v. Webber*, 716 A.2d 738 (R.I.1998), *State v.*

*Miller*, 679 A.2d 867 (R.I.1996), and *State v. Haslam*, 663 A.2d 902 (R.I.1995), I do not believe that Det. Springer's testimony that Williams was "not completely honest" served to enhance Williams's credibility when he later identified Lassiter as the shooter. In *Miller*, 679 A.2d at 872, this Court held that allowing a police officer to testify that a prosecution witness's failure to mention important information was not uncommon (because such witnesses often fail to appreciate the importance of the information they possess) directly bolstered the credibility of that witness's later testimony that filled in the missing information. But here, I do not believe that a police officer's testimony that a witness was "not completely honest" when he first spoke with the witness bolstered that witness's later contradictory version of the same events. Likewise, in *Webber*, 716 A.2d at 742, a witness was permitted to testify that certain evidence the jury heard was more reliable and credible than other evidence. This is the kind of direct bolstering of a witness's testimony that also was present in *Haslam*, 663 A.2d at 906, but simply was not present in this case. In short, I do not believe that Det. Springer's testimony "squarely addressed and bolstered another witness's credibility," *Miller*, 679 A.2d at 872, when he testified that Williams was "not completely honest" when they first spoke. On the contrary, if it had any effect whatsoever, it would have underscored the fact that Williams was quite capable of lying to the police when he wanted to do so. In any event, it did not speak to or bolster the credibility of Williams's identification of Lassiter as one of the shooters.

Unfortunately, this case is a grim reminder that, all too rapidly, the "bolstering" doctrine has become the third rail of Rhode Island criminal law: if a prosecution witness so much as touches on what he or she thinks about another witness's

out-of-court statements or credibility, it becomes a fatal reversible error, requiring the vacating of a conviction and a new trial. In my judgment, the best proof that this doctrine has gone too far is its application to the facts of this case, one in which the characterizing of another witness's out-of-court statement as "not completely honest" is deemed to bolster that witness's credibility in the eyes of the jury when the witness later testifies to a different version at trial.

For these reasons, I would affirm the convictions.